UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,
STATE OF FLORIDA, and DONALD
ROBERTSON,

       Plaintiffs,

v.                                                                Case No:  2:16-cv-798-JLB-KCD

MILLENNIUM PHYSICIAN
GROUP, MILLENNIUM
ACCOUNTABLE CARE
NETWORK OF INDEPENDANT
PHYSICIANS, LLC,
MILLENNIUM INDEPENDENT
PROVIDER NETWORK, LLC, ROY
MCKINLEY, ROBERT BRAY,
KEVIN KOENINGER, KEVIN
KEARNS, GUERT PEET, EDGAR
A. PEET, DAVID MCATEE,
LYNETTE LLERENA,
MILLENNIUM HOME HEALTH
HOLDINGS, LLC. and
MILLENNIUM HOME CARE,
LLC.,

       Defendants.

               /

## ORDER[1]

In this *qui tam* action, Donald Robertson, the Relator here, filed a complaint

under seal in October 2016 that raised several claims under the False Claims Act[2]

---

[1] Documents hyperlinked to CM/ECF are subject to PACER fees.  By using
hyperlinks, the Court does not endorse, recommend, approve, or guarantee any
third parties or the services or products they provide, nor does it have any
agreements with them.  The Court is also not responsible for a hyperlink's
availability and functionality, and a failed hyperlink does not affect this Order.
[2] 31 U.S.C. § 3729 *et seq.*

("FCA") on behalf of the United States of America, and several claims in his personal capacity.  (Doc. 1).  He filed an amended complaint in June 2021.  (Doc. 34).  Three months later, both the federal government and the state of Florida declined to intervene.  (Doc. 38; Doc. 39).  The Court ordered the complaint and amended complaint be unsealed in September 2021 (Doc. 40; Doc. 41), but the order was entered on March 25, 2022.  The clerk's office issued summonses as to all Defendants on April 19, 2022.  (Doc. 43).  Defendants executed a waiver of service on April 26, 2022, over five years after the Relator filed his complaint.[3]  (Doc. 44).

Now Defendants move to dismiss the amended complaint.  (Doc. 47).  The parties have fully briefed the issues.  (Doc. 61; Doc. 64).  For the following reasons, the motion to dismiss is GRANTED.

---

[3] Among Defendants' arguments for dismissal is their objection to the timing of service.  They contend this case should be dismissed in its entirety for failure to comply with Federal Rule of Civil Procedure 4(m), which requires a plaintiff to serve the defendant with a summons and the complaint within 90 days of filing the complaint.  (Doc. 47 at 22–23.)  If the plaintiff fails to meet this deadline, the court must dismiss the action without prejudice or order service be made within a specified time.  Fed. R. Civ. P. 4(m).  But "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."  *Id.*  "Good cause" exists only when some outside factor, like reliance on faulty counsel prevented service; neither inadvertence nor negligence constitutes good cause.  *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277, 1281 (11th Cir. 2007).  Here, although the Court ordered the Relator's complaint to be unsealed in September 2021, that order was not carried out until March 25, 2022.  This cannot be attributed to the Relator's inadvertence or negligence; instead it stemmed from a mistake beyond the Relator's control.  The Court declines to dismiss the case on this basis.

**BACKGROUND**

Millennium Physician Group ("MPG") is a private comprehensive primary care practice with over 200 healthcare providers and 1,000 home health professionals in southwest Florida. (Doc. 34 at 4, 9). The Relator is a doctor of osteopathic medicine who became an MPG employee after the company acquired his practice in 2011. (*Id.* at 4, 7). In October 2014, the Relator met with a Medicare fraud investigator, and "[a]fter MPG became aware of [the Relator's] whistleblower activity, MPG terminated [him] on May 7, 2015." (*Id.* at 5).

The Relator filed this *qui tam* action against MPG, several related companies, executive and administrative officers, and physician employees (collectively, "Defendants"). (*Id.* at 4, 7–11). The Relator alleges MPG has defrauded the government and increased its revenue by billing Medicare and Medicaid for medically unnecessary testing, by falsifying patient charts, by incentivizing improper referrals, and by improperly inflating their risk management measurements and Accountable Care Organization ("ACO") scores and bonuses. (*Id.* at 4–6).

The Relator explains that ACO refers to a group of providers and suppliers who work collectively to coordinate care for their Medicare patients by sharing electronic medical records ("EMRs"), testing data, prescription history, etc. (*Id.* at 13.) ACOs are rewarded for the number of mammograms and colorectal tests their patients receive, the number of patients who are diagnosed with and treated for

diabetes and heart disease, reports of healthy blood pressure in diabetic patients, and patient feedback.  (*Id.* at 14).

ACOs that meet performance and quality of care standards while limiting their costs (i.e., meeting or exceeding a minimum savings rate ("MSR")) receive a portion of the savings they generate, but ACOs that lose money must pay Medicare for the losses.  (*Id.* at 13–14).

The Relator alleges he attended meetings in which Dr. David McAtee, an MPG physician-employee, encouraged employees to inflate MPG's MSR by embellishing diagnoses on patient charts.  (*Id.* at 9, 15).  This embellishment allegedly took several forms: adding all possible diagnoses for a test to a patient chart; characterizing any diagnosis as "chronic"; and adding false diagnoses, like renal diagnoses and complications related to diabetes.  (*Id.* at 16, 47–48).

MPG contracted with an unnamed outside firm to help manage its EMRs; that firm was allegedly empowered to add diagnoses to patient charts without the approval or knowledge of the supervising physician.  (*Id.* at 16–17).  The Relator alleges MPG used this firm to add multiple fraudulent diagnoses and game the Medicare system.  (*Id.* at 17).  Dr. McAtee allegedly instructed physicians to accept all diagnoses imported by MPG's EMR software, even though many such diagnoses were inaccurate.  (*Id.* at 17–18).  The Relator also lists three employees who were designated to add, or directed other employees to add, diagnoses to EMRs.  (*Id.* at 24, 29, 35).  The Relator also alleges Defendants falsified patient records by claiming to have performed procedures never actually performed.  (*Id.* at 45–46).

The amended complaint includes information on about 40 patients whose records were allegedly incorrect.  (*Id.* at 20–46).

When the Relator noticed the frequent appearance of false diagnoses on his patients' medical records, he reported the issue to MPG's management, who responded: "You shouldn't even need to look at the diagnosis list, it doesn't even matter."  (*Id.* at 18–19).

But the Relator alleges the false diagnosis issue matters very much.  He alleges making patients appear sicker allowed MPG to elevate its MSR, increase its ACO bonus, and justify unnecessary testing.  (*Id.* at 45–47).  MPG cared so much about testing, and the revenue it generated, that it financially rewarded employees for ordering tests and contributing to the company's testing revenue.  (*Id.* at 54–55).  And it chastised those employees it viewed as not pulling their weight.  (*Id.* at 55).

The Relator alleges MPG also games the system through its home-health and referral practices.  (*Id.* at 68–75).  He alleges MPG's subsidiary home healthcare company is a significant driver of MPG's annual revenue.  (*Id.* at 74–75).  And the financial success of the operation is allegedly attributable to the practice of maintaining an exceedingly low patient recertification rate—the rate at which a patient is approved for longer than the standard 60-day period for home healthcare. (*Id.* at 72–74).  By keeping that recertification rate low, MPG can appear to save Medicare money by providing better care to patients.  (*Id.* at 73).  This strategy increases MPG's ACO score and inflates its share of the savings.  (*Id.*).

But the Relator alleges that, in actuality, home healthcare is not suitable for many patients who receive it, and many are left to seek more care after they are discharged from home healthcare.  (*Id*.).  At times, that extra care allegedly comes from MPG, which will sometimes send a clinical provider to conduct home visits to "convince the patient and their family that the patient is doing fine at home."  (*Id*.).  The Relator alleges that many patients that come to MPG's home healthcare system are referred from within, but that the company has also cultivated a network of providers with whom it arranges reciprocal referrals.  (*Id*. at 69–72).  By keeping the referral rate up and the recertification rate down, MPG can game the system and maximize profits.  (*Id*. at 68–73).

Turning to his personal experience with MPG, the Relator states that when he complained about the company's false diagnosis and fraudulent testing policies, MPG retaliated against him by understaffing his office, referring his patients elsewhere, harassing him, physically intimidating him, and ignoring his requests for assistance.  (*Id*. at 5, 56–59).  This alleged retaliation ended with his termination on May 7, 2015, at which Tony Peet, an MPG executive, allegedly made such a violent scene that the Relator directed his staff to call the Sherriff's office.  (*Id*. at 57–60).

After terminating the Relator, MPG allegedly interfered with his ability to practice independently by misappropriating the Relator's office phone number; redirecting the Relator's patient phone calls; reassigning patients to other MPG physicians; slandering the Relator; stealing the Relator's mail; damaging the

Relator's office and property; cancelling the Relator's contracts with insurance companies and instructing them to remove him as a provider; and terminating the Relator's medical malpractice insurance. (*Id.* at 60–66).

The Relator filed this *qui tam* action on October 27, 2016 (Doc. 1), and he filed an amended complaint on June 9, 2021 (Doc. 34). The amended complaint raises fourteen counts: violations of the FCA (Counts I–IV, VIII, IX, and XIV[4]); violations of the Florida False Claims Act[5] (Count V and VI); FCA retaliation[6] (Count VII); tortious interference with contract (Count X); defamation (Count XI); civil assault (Count XII); and civil battery (Doc. XIII).[7] (Doc. 34 at 75-92).

## PLEADING REQUIREMENTS

### A. Standard of Review

A court considering a motion to dismiss accepts the complaint's allegations as true and construes those allegations and all reasonable inferences that can be drawn from them in the relator's favor. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

A relator must satisfy the general pleading standards of Federal Rule of Civil Procedure 8. The relator's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a).

---

[4] The amended complaint designates this count as "Count XVI." (Doc. 34 at 91).
[5] Fla. Stat. § 68.082(2)(a).
[6] 31 U.S.C. § 3730(h).
[7] Defendants represent that the Relator agrees Counts XI (defamation), XII (civil assault), and XIII (civil battery) should be dismissed. (Doc. 47 at 2 n.2, 23–24; Doc. 64 at 6.) The Relator does not state this position, but neither does he defend these counts. Counts XI, XII, and XIII are therefore dismissed without prejudice.

And it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

But it is also well settled that Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements apply to complaints alleging violations of the FCA. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308–10 (11th Cir. 2002). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014) (quoting *U.S. ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1359 (11th Cir.2006) (quotation marks omitted)).

To satisfy this standard, a relator "must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen*, 290 F.3d at 1310 (11th Cir. 2002) (citations and internal quotation marks omitted). And a relator must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). So "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *Mastej*, 591 F.

App'x at 703–04 (quoting *U.S. ex rel. Matheny v. Medco Health Sols. Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012)).

## B. The False Claims Act[8]

"The FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello*, 428 F.3d at 1012. A relator may not "describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Instead, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

The FCA provides for penalties of $5,000–$10,000 per claim and treble damages. *Id.* at 1307–08 (citing 31 U.S.C. § 3729(a)). And if the government

---

[8] Because Florida's False Claims Act is modeled after the FCA, the Court will consider arguments for dismissal of the claims under both statutes together. *See U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007) ("The Florida FCA, is modeled after and tracks the language of, the federal False Claims Act.").

declines to intervene (as here), the plaintiff-relator can receive 25–30% of any recovery and reasonable expenses and attorneys' fees. *Id.* at 1308 (citing 31 U.S.C. § 3730(d)).

### C. FCA Retaliation

To establish retaliation under the FCA, a plaintiff must show he was "discriminated against in the terms and conditions of employment" for engaging in protected activity. 31 U.S.C. § 3730(h)(1). Discharge, demotion, suspension, threats, and harassment are all forms of unlawful discrimination. *Id.* The FCA defines protected activity as "lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." *Id.* To show retaliation, the plaintiff must establish a causal connection between the retaliation and the protected activity; the retaliation must be "because of" the protected activity. *Id.* The plaintiff must therefore show that his employer was at least aware of the protected activity. *U.S. ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791–92 (11th Cir. 2018) (citation omitted).

### D. The Stark Law

"The Stark Law prohibits doctors from referring their Medicare and Medicaid patients to business entities with which the doctors have a financial relationship." *Ameritox, Ltd. v. Millennium Labs., Inc.*, No. 8:11-cv-775-T-24-TBM, 2014 WL 1456377, at *3 (M.D. Fla. Apr. 14, 2014) (citation omitted). One such financial relationship is a compensation arrangement involving any remuneration— directly or indirectly, overtly or covertly, in cash or in kind—between a doctor and

the entity.  *See id.* (citing 42 U.S.C. § 1395nn(a)(2)(B), § 1395nn(h)(1)).  "Thus, the

Stark Law prohibits doctors who have a compensation arrangement with an entity

from making referrals of Medicare or Medicaid patients for clinical laboratory

services to that entity."  *Id.* (citations omitted).

## DISCUSSION

### A.  Counts I–VI, VIII–IX, and XIV: FCA Claims[9]

#### 1.  The FCA's First-to-File Rule

Defendants argue the FCA mandates dismissal of the Relator's FCA claims,

based on the claims raised in the related action, U.S. ex rel. Shepperd v.

Millennium et al., No. 2:16-cv-726-JLB-KCD.  (Doc. 47 at 2–5).  The Relator

responds that his FCA claims are based on facts distinct from those supporting Mr.

Shepperd's claims and so both cases may move forward.  (Doc. 61 at 8–9).

"When a person brings an action under [the FCA], no person other than the

Government may intervene or bring a related action based on the facts underlying

the pending action."  31 U.S.C. § 3730(b)(5).  The Eleventh Circuit addressed the

---

[9] Defendants argue the Relator's FCA claims must be dismissed for failure to plead materiality.  (Doc. 47 at 17–19).  This argument for dismissal would be appropriate if the Relator were advancing an implied false certification theory (*i.e.*, alleging Defendants submitted a claim that was false or fraudulent because it misrepresented compliance with all material statutory, regulatory, and contractual requirements for payment).  *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 180 (2016).  But it is not entirely clear that the Relator is raising such a theory.  And he has not illuminated his position by addressing Defendants' argument in his response.  Consequently—and because there are several other reasons this amended complaint should be dismissed—the Court will not address this argument further.

FCA's first-to-file rule in *Cho v. Surgery Partners, Inc.*, 30 F.4th 1035 (11th Cir. 2022). The court adopted the "same material elements" test and explained, "the first-filed and later-filed claims need not be identical; they need only be 'related.'" *Cho*, 30 F.4th at 1042. To make this determination, courts are to compare the two complaints side-by-side and ask "whether the later complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint." *See id.* (citations and internal quotation marks omitted). When a *qui tam* action relates to an earlier-filed complaint, it is deemed "incurably flawed from the moment it is filed." *See Cho*, 30 F.4th at 1044.

Mr. Shepperd filed his case on September 26, 2016, and the Relator here filed his case on October 27, 2016. The relators in both cases alleged Defendants falsified patient records,[10] incentivized unnecessary diagnostics and testing,[11] falsified coding,[12] claimed to have performed services never rendered,[13] and unlawfully incentivized referrals.[14] And while, as the Relator argues, there are differences between the two complaints, there are myriad, essential facts in common that these complaints must be deemed "related" for the FCA's first-to-file rule.

This conclusion follows the Eleventh Circuit's analysis in *Cho*, where the Court recognized that the later-filed complaint named defendants and made a substantive allegation not included in the first-filed complaint, but still concluded

---

[10] *Compare* Doc. 34 at 15–18, 24, 29, 35 *with* No. 2:16-cv-726 Doc. 1 at 15–16.
[11] *Compare* Doc. 34 at 47–52  *with* No. 2:16-cv-726 Doc. 1 at 15–16, 18.
[12] *Compare* Doc. 34 at 20 *with* No. 2:16-cv-726 Doc. 1 at 15.
[13] *Compare* Doc. 34 at 45–46 *with* No. 2:16-cv-726 Doc. 1 at 2, 20.
[14] *Compare* Doc. 34 at 69–72 *with* No. 2:16-cv-726 Doc. 1 at 16–21.

these additions did not meaningfully magnify the scope or pervasiveness of the defendants' alleged schemes.  See 30 F.4th at 1043–44.  Because the government would have been equipped to investigate Defendants based on only Mr. Shepperd's complaint, the FCA's first-to-file rule mandates dismissal of the Relator's FCA claims.

### 2.    Rule 9(b)'s Heightened Pleading Standard

Defendants contend the Relator has failed to identify with particularity any false claim submitted to and paid by the Government, and that defect requires dismissal.  (Doc. 47 at 5–11).  The Relator disagrees and argues he has alleged FCA violations by identifying the ACO bonuses the government paid to MPG, identifying patients whose records were falsified, identifying the practice of ordering unnecessary tests, and offering at least one sample claim.[15]  (Doc. 61 at 9–11).

In *United States ex rel. Clausen v. Laboratory Corporation of America, Inc.*, the Eleventh Circuit explained the centrality of false claim submission to an FCA claim:

> The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe. . . .  Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as

---

[15] The Relator cites paragraphs 293–97 of his "complaint."  (Doc. 61 at 11).  Those paragraphs from the amended complaint detail Patient M.K.'s injured tailbone, MPG's attempts to order an MRI for M.K., and M.K.'s refusal of that MRI.  (Doc. 34 at 52).  And those paragraphs from the Relator's original complaint describe actions MPG allegedly took before and after terminating the Relator.  (Doc. 1 at 61).

> required under the False Claims Act. . . . The submission
> of a claim is thus not, as Clausen argued, a "ministerial
> act," but the *sine qua non* of a False Claims Act violation.

*Clausen*, 290 F.3d at 1311 (citations omitted).  The court concluded Clausen's

complaint fell short because it had no allegation stating with particularity a false

claim actually submitted to the government.  *Id.* at 1311–12.  The court noted

Clausen's complaint could have been bolstered by identifying amounts charged,

alleging actual dates, describing policies about billing or second-hand information

about billing practices, or providing a bill or proof of payment.  *Id.* at 1312.  And as

a corporate outsider, Clausen could offer no other indicia of reliability for his claims.

*See id.* at 1314.

Next, in *United States ex rel. Mastej v. Health Management Associates, Inc.*,

the Eleventh Circuit offered an alternative path to establishing reliability.  591 F.

App'x at 707–09.  Mastej held two executive positions with the defendant

corporations, through which he gained direct information about billings and

revenues, and he was present for meetings in which executives discussed the

submission of Medicare bills.  *Id.* at 695–96, 707-08.  The court concluded that,

given Mastej's extensive experience and access to first-hand knowledge, the

complaint had sufficient indicia of reliability to state a claim under Rule 9(b).  *Id.* at

707–09.  But the court was also explicit that the fraud alleged in that case did not

depend on particularized medical or billing content of any given claim form—and that distinction was "critical" to the court's conclusion.[16]  *Id.* at 708.

    This case is inapposite to what the Eleventh Circuit considered in Mastej. The claims here fall squarely within the categories of cases the Eleventh Circuit listed as relying heavily on particularized medical or billing content of particular claim forms.  *See id.* (*e.g.*, claims for services not rendered and claims for services that were unnecessary, overcharged, or miscoded).  And Mastej gained direct personal knowledge through his years of executive employment with the defendant and the exposure to the defendant's billing practices and decisions.  *Id.* at 695–96, 707-08.  Here, the Relator is a physician with no apparent experience in billing or claim submission.  (Doc. 34 at 7).  With no allegation stating with particularity a false claim submitted to the Government, or other indicia of reliability, the Relator's claims are insufficient.[17]

---

[16] <u>Mastej</u> "turn[ed] on the [d]efendants' submitting interim claims to the government for referred Medicare patients after having engaged in an incentive-for-referral scheme and then falsely certifying at year-end that they [had] complied with the applicable healthcare laws."  591 F. App'x at 708.  The Eleventh Circuit explained that though the patient name was necessary to determine if the patient was referred by one of the doctors implicated in the scheme, "the type of medical service rendered and described in that interim claim, the billing code, or what was charged for that service are not the underlying fraudulent acts."  *Id.*

[17] The Relator also relies on <u>*U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005)</u>, in which the Eleventh Circuit concluded "that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ whose conversations about the defendant's billing practices with the defendant's office manager formed the basis for the relator's belief that claims were actually submitted to the government."  *See* <u>*Mastej*, 591 F. App'x at 704</u>.  As in *Mastej*, the Relator here and the relator in *Walker* are not similarly situated.

Second, Defendants assert dismissal is appropriate because the Relator has not adequately pleaded the "who, what, when or how" of the allegedly fraudulent conduct with the specificity that Rule 9(b) requires. (Doc. 47 at 11–14). The Relator disagrees and states he provided the who, what, where, when, and how by including information about the patient records MPG allegedly falsified and the bonus payments MPG allegedly received. (Doc. 61 at 10).

To state an FCA claim with particularity, the Relator must allege "'facts as to time, place, and substance of the defendant's alleged fraud,' [and] 'the details of the defendants['] allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Clausen*, 290 F.3d at 1308 (citations omitted). Thus, to satisfy Rule 9(b), a relator must allege the "who," "what," "where," "when," and "how" both of the defendant's improper practices and of the defendant's fraudulent submissions to the government. *See Corsello*, 428 F.3d at 1014.

To be sure, the Relator's 94-page amended complaint provides many examples of patient medical records that do not accurately reflect the individual patients' status or the care they received. But aside from alleging the existence of those many falsified records, the amended complaint does not provide necessary information linking those records to specific improper conduct by specific defendants. The same is true of the Relator's allegations about unlawful referrals and improper home healthcare practices. The complaint provides significant detail suggesting problems in the system, but it does not show how those problems can be traced to the specific improper conduct of the many named defendants. And these

are the sorts of allegations that a complaint must contain to state an FCA claim with particularity under Rule 9(b). *Id.* For this second, independent reason, the Relator's FCA claims are dismissed.

Third, Defendants argue the FCA counts should be dismissed based on the Relator's use of the collective "Defendants" throughout the background section and the FCA counts. (Doc. 47 at 14–16). The lumping together of several defendants to allege generally their collective participation in a fraud scheme cannot meet Rule 9(b)'s particularity requirement. *United States v. Norman*, No. 8:15-cv-1506-T-23AEP, 2018 WL 264253, at *1 (M.D. Fla. Jan. 2, 2018). A relator must, instead, "describe with particularity each defendant's participation in the alleged fraud . . . ." *See id.*

The Relator refers to Defendants collectively throughout the complaint, including in his FCA counts. This generalized pleading deprives a defendant of detail about his alleged participation in a fraud and impairs his ability to respond. *See id.* Both for this reason and for the reasons outlined above, the Relator has not pleaded "details of . . . [D]efendants' allegedly fraudulent acts, when they occurred, and who engaged in them" sufficient to satisfy Rule 9(b). *See Clausen*, 290 F.3d at 1308 (citations omitted).

And finally, Defendants seek dismissal of any claims submitted after the Relator's term of employment with MPG because any such claims would lack sufficient indicia of reliability. (Doc. 47 at 16–17). The Eleventh Circuit has never held that a relator can never base his case on false claims submitted outside of his

employment with the would-be defendant. *See, e.g., Mastej*, 591 F. App'x at 709. As such, the Court is unwilling to reject out of hand any claim that does not fit neatly within the term of the Relator's employment.

Still, because the Relator's FCA claims do not meet the pleading requirements of Rule 9(b) or Eleventh Circuit precedent, they are dismissed.

### B. Count VII: FCA Retaliation

Defendants seek dismissal of the Relator's FCA retaliation claim because he has failed to allege he acted to further an FCA action, or to stop an FCA violation, and because he has not alleged that MPG knew of any such actions or efforts. (Doc. 47 at 19–22). Defendants also argue the Relator's FCA retaliation claim should be dismissed for failure to plead a causal connection between protected conduct and his termination. (Doc. 47 at 22).

The Relator responds that he alleged both types of protected activity: he acted to further the FCA when he reported the false diagnoses issue to MPG management, and he tried to stop an FCA violation by annotating the patient records he considered to have been falsified. (Doc. 61 at 18). He disputes Defendants' argument about notice, asserting it would be unreasonable to think that his repeated complaints directly to MPG management would not put them on notice of a distinct possibility of litigation. (Doc. 61 at 20). And he contends he established a causal connection between his protected activity and MPG's alleged retaliation by noting several adverse employment actions that occurred after he made complaints. (Doc. 61 at 21–22).

To state an FCA retaliation claim under 31 U.S.C. § 3730(h), a relator must allege:

> (1) [the employee] was acting in furtherance of a[n] FCA enforcement action *or* other efforts to stop violations of the FCA, *i.e.*, engaging in protected conduct, (2) the employer knew that the employee was engaged in the protected conduct, and (3) the employer was motivated to take an adverse employment action against the employee because of the protected conduct.

*Farnsworth v. HCA, Inc.*, No. 8:15-cv-65-T-24-MAP, 2015 WL 3453621, at *2 (M.D. Fla. May 29, 2015) (citations omitted, emphasis added).  To recover under § 3730(h), a relator must, "at a minimum, . . . show that the activity they were fired over had something to do with the False Claims Act—or at least that a reasonable person might have thought so."  *See Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021).

"[T]he relevant question for determining whether [a p]laintiff has alleged protected conduct is whether his allegations raise at least a reasonable inference that [the p]laintiff (1) engaged in lawful acts in furtherance of a False Claims Act suit when such a suit was a distinct possibility or (2) attempted to stop a violation of the Act based on an objectively reasonable belief that violations had occurred." *Lord v. Univ. of Miami*, 571 F. Supp. 3d 1299, 1310 (S.D. Fla. 2021) (citing *U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 201–02 (4th Cir. 2018)).  And so, protected activity under § 3730(h) comes in two general forms.

First, § 3730(h) protects any "lawful acts done by the employee . . . in furtherance of an action under this section . . . ." 31 U.S.C. § 3730(h).  This

protection applies "not only where a false claims action is actually filed, but also where the filing of such an action, by either the employee or the government, was a 'distinct possibility' at the time the assistance was rendered." *Lord*, 571 F. Supp. 3d at 1311 (quoting *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996)).

Second, § 3730(h) protects "[a] plaintiff [who] makes 'efforts to stop 1 or more violations of' the False Claims Act if he is 'motivated by an objectively reasonable belief that the employer is violating, or will soon violate, the [False Claims Act].' " *Id.* at 1310 (quoting *Grant*, 912 F.3d at 201 (alteration added)). "A plaintiff's belief that his employer is violating the Act 'is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the [Act], that his belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the [Act].'" *Id.* (quoting *Grant*, 912 F.3d at 201–02 (alterations added)).

Regardless of the protected activity, a plaintiff must allege both that a defendant-decisionmaker had notice of the protected conduct and that the protected activity was the but-for cause of the alleged retaliatory conduct. *See id.* at 1313. "To establish causation under § 3730(h)(1), the plaintiff must show that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct . . . ." *Kalch v. Raytheon Tech. Servs. Co., LLC*, No. 6:16-c-1529-Orl-40KRS, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (citing *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015)).

"It is not enough for other employees, supervisors, or members of the employer's management to know about the plaintiff's protected conduct where these individuals have no decision-making authority." *Id.*

The Relator alleges he "informed MPG's management of the false diagnoses issue, however, they responded in a manner similar to '[y]ou shouldn't even need to look at the diagnosis list, it doesn't even matter.'" (Doc. 34 at 19). Later, he alleges he "complained about MPG entering false diagnoses and fraudulent testing policies in 2012 and at almost all staff meetings from 2013 through to his termination in May 2015." (Doc. 34 at 56). Allegedly in response to his "complaints," MPG cut support to the Relator's office and ordered staff to refer patients to other MPG doctors, and Tony Peet often harassed the Relator in his office. (Doc. 34 at 57-58). The Relator then alleges, "[i]n 2014, after years of fighting back against the false diagnoses on patient charts, [he] spoke to an employee in MPG's billing department." (Doc. 34 at 57). He also spoke with a Medicare fraud investigator in October 2014. (Doc. 34 at 5). And then, on May 7, 2015, MPG terminated the Relator. (Doc. 34 at 57).

The Relator does not allege that his complaints came when there was a distinct possibility that he or the government would sue Defendants under the FCA and that he acted to further that action. *See U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303–04 (11th Cir. 2010). And given his failure to allege with particularity that MPG ever actually submitted a fraudulent claim, he has not alleged that he sought to prevent at least one FCA violation. *U.S. ex rel. Oemar v.*

*Glades Drugs, Inc.*, No. 15-81633-CIV-COHN-SELTZER, 2017 WL 6033550, at *3–4 (S.D. Fla. Oct. 26, 2017).

But even assuming the Relator's complaints constituted protected activity, he has failed to show that a decisionmaker had notice of his activities and that there was a causal link between his complaints and MPG's alleged retaliatory acts.  First, the Relator raised concerns and complaints against MPG's false diagnoses and fraudulent testing policies to "management," at staff meetings, and with a billing employee; and then he met with a Medicare fraud investigator in October 2014. (Doc. 34 at 5, 19, 56–57).  But it is unclear whether the decisionmakers in MPG (a practice with over 200 healthcare providers and 1,000 home health professionals (Doc. 34 at 4, 9)) were actually aware of those complaints.  And specifically, he does not allege that Tony Peet, the only named defendant alleged to have harassed the Relator, had notice of these activities.

And though the Relator's work conditions deteriorated from 2012 through his termination in May 2015, the complaint lacks any factual allegation that connects a particular complaint and a discriminatory act.  The tenor of the responses the Relator's complaints evoked illustrates a dismissiveness that belies any urgency that the threat of impending litigation by the Relator or the government might inspire.  And offering no factual allegation about who, when, or how MPG learned of his meeting with a Medicare fraud investigator, the Relator makes the conclusory statement that he was terminated "[a]fter MPG became aware of [his] whistleblower activity," even if over six months after his interview with the

22

Medicare fraud investigator happened.  (Doc. 34 at 5).  But conclusory statements cannot show a causal link, and without that link, the Relator cannot state a claim for FCA retaliation.  For these reasons, Count VII is dismissed.

### C. Count X: Tortious Interference

Defendants argue that, should the Court dismiss the Relator's federal claims, the Court should also decline to exercise jurisdiction over the Relator's remaining state-law claim: tortious interference with contract.[18]  (Doc. 47 at 23–24).

The Court has dismissed all the federal claims in this case.  And though a federal district court is given supplemental jurisdiction over state-law claims that "form part of the same case or controversy" as federal claims over which it has original jurisdiction, a court "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . . [it] has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(a), (c)(3).  "The decision to exercise supplemental jurisdiction over pendent state claims rests within the discretion of the district court." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) (citation omitted).  And in circumstances like the ones here, the Eleventh Circuit encourages district courts to decline supplemental jurisdiction.  *Id.* at 1089.

The Court declines to exercise supplemental jurisdiction over the Relator's tortious interference claim, and it dismisses the claim without prejudice.  *See* 28 U.S.C. § 1367(c).

---

[18] Defendants also raise a substantive attack on this claim.  (Doc. 47 at 23–24).  The Relator responds to this substantive attack but does not address the issue of supplemental jurisdiction.  (Doc. 61 at 23–24).

## CONCLUSION

As it is currently pleaded, the Relator's amended complaint is foreclosed by the FCA's first-to-file rule.  The Relator argues that, should the Court determine dismissal is appropriate, he should be given an opportunity to amend.

Accordingly, it is now

**ORDERED:**

(1) Defendants' Motion to Dismiss (Doc. 47) is **GRANTED**.

(2) The amended complaint (Doc. 34) is **DISMISSED WITHOUT PREJUDICE**.

(3) If Mr. Robertson intends to file a second amended complaint, he is directed to do so by March 8, 2023.  Otherwise, this case will be closed without further notice.

**ORDERED** at Fort Myers, Florida on February 15, 2023.

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE